1  **LEILA W. MORGAN**
California State Bar No. 232874
2  **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
3  San Diego, CA 92101-5030
(619) 234-8467/Fax: (619) 687-2666
4  E-Mail: Leila_Morgan@fd.org

5  Attorneys for Mr. Villareal-Ramos

6

7

8  UNITED STATES DISTRICT COURT

9  SOUTHERN DISTRICT OF CALIFORNIA

10  **(HONORABLE ROGER T. BENITEZ)**

| | | |
|---|---|---|
| 11  UNITED STATES OF AMERICA, | ) | Case No. 08CR0095-BEN |
| 12  Plaintiff, | ) | STATEMENT OF FACTS AND |
| | ) | MEMORANDUM OF POINTS AND |
| 13  v. | ) | AUTHORITIES IN SUPPORT OF |
| | ) | DEFENDANT'S MOTIONS |
| 14  **JOSE VILLAREAL-RAMOS**, | ) | |
| | ) | |
| 15  Defendant. | ) | |
| | ) | |
| 16  ———————————————— | ) | |

17  **I.**

**STATEMENT OF FACTS**[1]

18

19  **1.    The Arrest of Mr. Villareal-Ramos**

20          On December 12, 2007, Mr. Villareal-Ramos was arrested by Border Patrol Agents near an

21  area known as "Washer Woman's" in the Imperial Beach Border Patrol Station's area of operations.

22  This area is two miles east of the San Ysidro, California Port-of-Entry and approximately 150 yards

23  north of the U.S. Mexico International Border.    At approximately 9:30 p.m., Agent Avila

24  encountered Mr. Villareal-Ramos and two others laying down amidst rocks and brush.    All three

25

26  ————————————————

27          [1]  Unless otherwise stated, the "facts" referenced in these papers come from government-
produced discovery that the defense continues to investigate.  Mr. Villareal-Ramos does not admit
28  the accuracy of this information and reserves the right to challenge it at any time.

1 were questioned regarding their immigration status, all admitted to being citizens and nationals of

2 Mexico with no documents allowing them to enter or reside in the United States.

3        On December 13, 2007, at approximately 12:30 p.m., and approximately 15 hours after his

4 arrest, Mr. Villareal-Ramos was read his Miranda rights and questioned.  During this questioning

5 he made incriminating statements regarding his involvement in the offense.  On December 18, 2007,

6 a complaint was filed charging Mr. Villareal-Ramos with violations of 8 U.S.C. § 1324.  On

7 December 26, 2007, Mr. Villareal-Ramos made his initial appearance before Magistrate Judge Leo

8 S. Papas.  On January 9, 2008, the grand jury returned the indictment in this case, charging Mr.

9 Villareal-Ramos with Conspiracy to Transport and Harbor Illegal Aliens, Bringing in Illegal Aliens

10 for Financial Gain and Transportation of Illegal Aliens, all in violation of Title 8 U.S.C. § 1324.

11 **2.    Grand Jury and Indictment**

12       The indictment in the instant case was returned by the January 2007 grand jury.  That grand

13 jury was instructed by the Honorable Larry A. Burns, United States District Court Judge on January

14 11, 2007.  *See Reporter's Partial Transcript of the Proceedings*, dated January 11, 2007, a copy of

15 which is attached hereto as Exhibit A.  Judge Burns' instructions deviate from the instructions at

16 issue in the major Ninth Circuit cases challenging a form grand jury instruction previously given in

17 this district in several ways.[2]

18       After repeatedly emphasizing to the grand jurors that probable cause determination was their

19 sole responsibility, *see Ex. A* at 3, 3-4, 5,[3] Judge Burns instructed the grand jurors that they were

20 forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or

21 not there should be a federal law or should not be a federal law designating certain activity [as]

22 criminal is not up to you."  See id. at 8.  The instructions go beyond that, however, and tell the grand

23 jurors that, should "you disagree with that judgment made by Congress, then your option is not to

24

25       [2]   *See, e.g., United States v. Cortez-Rivera*, 454 F.3d 1038 (9th Cir. 2006); *United States

26 v. Navarro-Vargas*, 408 F.3d 1184 (9th Cir.) (en banc), *cert. denied*, 126 S. Ct. 736 (2005) (*Navarro-Vargas II*); *United States v. Navarro-Vargas*, 367 F.3d 896 (9th Cir. 2004)(*Navarro-Vargas I*);

27 *United States v. Marcucci*, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

28       [3]  *See also id.* at 20 ("You're all about probable cause.").

say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' or

'I'm going to vote in favor of even though the evidence may be insufficient.'" *See id.* at 8-9. Thus,

the instruction flatly bars the grand jury from declining to indict because the grand jurors disagree

with a proposed prosecution.

Immediately before limiting the grand jurors' powers in the way just described, Judge Burns

referred to an instance in the grand juror selection process in which he excused three potential jurors.

*See id.* at 8.

> I've gone over this with a couple of people.  You understood from the questions and answers that a couple of people were
>
> excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.

*Id.* That "principle" was Judge Burns' discussion of the grand jurors' inability to give effect to their

disagreement with Congress.  *See id.* at 8-9. Thus, Judge Burns not only instructed the grand jurors

on his view of their discretion; he enforced that view on pain of being excused from service as a

grand juror.

In addition to his instructions on the authority to choose not to indict, Judge Burns also

assured the grand jurors that prosecutors would present to them evidence that tended to undercut

probable cause.  *See id.* at 20.[4]

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury.  You're all about probable cause.  If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well.  As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence*.

*Id.* (emphasis added).[5]  The district court later returned to the notion of the prosecutors and their

duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from

---

[4]    These instructions were provided in the midst of several comments that praised the United States attorney's office and prosecutors in general.

[5]    The "in most instances" language suggests that there may be some limit on this principle. Again, counsel has ordered the full transcript, and it will likely resolve the question posed in the instant footnote.

1   of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to

2   you." *See id.* at 27.

3

4       These motions follow.

5                                        **II.**

6                        **MOTION TO COMPEL DISCOVERY**

7       Mr. Villareal-Ramos requests the following discovery.  His request is not limited to those

8   items of which the prosecutor is aware.  It includes all discovery listed below that is in the custody,

9   control, care, or knowledge of any "closely related investigative [or other] agencies." *See United*

10  *States v. Bryan*, 868 F.2d 1032 (9th Cir. 1989).

11      1.    The Defendant's Statements.  The government must disclose to Mr. Villareal-Ramos

12  *all* copies of any written or recorded statements made by Mr. Villareal-Ramos; the substance of any

13  statements made by Mr. Villareal-Ramos that the government intends to offer in evidence at trial;

14  any response by Mr. Villareal-Ramos to interrogation; the substance of any oral statements that the

15  government intends to introduce at trial and any written summaries of Mr. Villareal-Ramos's oral

16  statements contained in the handwritten notes of the government agent; any response to any *Miranda*

17  warnings that may have been given to Mr. Villareal-Ramos; and any other statements by Mr.

18  Villareal-Ramos.  Fed. R. Crim. P. 16(a)(1)(A) and (B).  The Advisory Committee Notes and the

19  1991 amendments to Rule 16 make clear that the government must reveal *all* Mr. Villareal-Ramos's

20  statements, whether oral or written, regardless of whether the government intends to make any use

21  of those statements.

22      2.    Arrest Reports, Notes and Dispatch Tapes.  Mr. Villareal-Ramos also specifically

23  requests that all arrest reports, notes and dispatch or any other tapes that relate to the circumstances

24  surrounding his arrest or any questioning, if such reports have not already been produced *in their*

25  *entirety*, be turned over to him.  This request includes, but is not limited to, any rough notes, records,

26  reports, transcripts or other documents in which statements of Mr. Villareal-Ramos or any other

27  discoverable material is contained.  **Mr. Villareal-Ramos includes in this request any redacted**

28  **portions of the Report of Investigation ("ROI") and any subsequent ROIs that the case agent**

1    **or any other agent has written.** This is all discoverable under Fed. R. Crim. P. 16(a)(1)(A) and

2    (B) and *Brady v. Maryland*, 373 U.S. 83 (1963). *See also Loux v. United States*, 389 F.2d 911 (9th

3    Cir. 1968). Arrest reports, investigator's notes, memos from arresting officers, dispatch tapes, sworn

4    statements, and prosecution reports pertaining to Mr. Villareal-Ramos are available under Fed. R.

5    Crim. P. 16(a)(1)(A) and (B), Fed. R. Crim. P. 26.2 and 12(I). Preservation of rough notes is

6    requested, whether or not the government deems them discoverable.

7         3.    <u>*Brady* Material</u>. Mr. Villareal-Ramos requests all documents, statements, agents'

8    reports, and tangible evidence favorable to him on the issue of guilt and/or that affects the credibility

9    of the government's case. Impeachment and exculpatory evidence both fall within *Brady's*

10   definition of evidence favorable to the accused. *United States v. Bagley*, 473 U.S. 667 (1985);

11   *United States v. Agurs*, 427 U.S. 97 (1976).

12        4.    <u>Any Information That May Result in a Lower Sentence</u>. As discussed above, any

13   information that may result in a more favorable sentence must also be disclosed pursuant to *Brady*,

14   373 U.S. 83. The government must disclose any cooperation or attempted cooperation by

15   Mr. Villareal-Ramos, as well as any information that could affect any base offense level or specific

16   offense characteristic under Chapter Two of the United States Sentencing Commission Guidelines

17   Manual ("Guidelines"). Also included in this request is any information relevant to a Chapter Three

18   adjustment, a determination of Mr. Villareal-Ramos's criminal history, or any other application of

19   the Guidelines.

20        5.    <u>The Defendant's Prior Record</u>. Evidence of a prior record is available under

21   Fed. R. Crim. P. 16(a)(1)(D). Mr. Villareal-Ramos specifically requests a complete copy of any

22   criminal record.

23        6.    <u>Any Proposed 404(b) Evidence</u>. Evidence of prior similar acts is discoverable under

24   Fed. R. Crim. P. 16(a)(1)(D) and Fed. R. Evid. 404(b) and 609. In addition, under Fed. R.

25   Evid. 404(b), "upon request of the accused, the prosecution . . . shall provide reasonable notice in

26   advance of trial . . . of the general nature . . .." of any evidence the government proposes to introduce

27   under Fed. R. Evid. 404(b) at trial. Sufficient notice requires the government to "articulate *precisely*

28   the evidential hypothesis by which a fact of consequence may be inferred from the other acts

1    evidence." *United States v. Mehrmanesh*, 689 F.2d 822, 830 (9th Cir. 1982) (emphasis added;

2    internal citations omitted); *see also United States v. Brooke*, 4 F.3d 1480, 1483 (9th Cir. 1993)

3    (reaffirming *Mehrmanesh* and reversing convictions).

4            This includes any "TECS" records (records of prior border crossings) that the government

5    intends to introduce at trial, whether in its case-in-chief, impeachment, or rebuttal.  Although there

6    is nothing intrinsically improper about prior border crossings, they are nonetheless subject to 404(b),

7    as they are "other acts" evidence that the government must produce before trial.  *United States v.*

8    *Vega*, 188 F.3d 1150, 1154-1155 (9th Cir. 1999).

9            Mr. Villareal-Ramos requests that such notice be given *three weeks before trial* to give the

10   defense time to adequately investigate and prepare for trial.

11           7.    Evidence Seized.  Evidence seized as a result of any search, either warrantless or with

12   a warrant, is discoverable under Fed. R. Crim. P. 16(a)(1)(E).

13           8.    Request for Preservation of Evidence.  The defense specifically requests that all

14   **dispatch tapes** or any other physical evidence that may be destroyed, lost, or otherwise put out of

15   the possession, custody, or care of the government and that relate to the arrest or the events leading

16   to the arrest in this case be preserved.  This request includes, but is not limited to **vehicle involved**

17   **in the case**, Mr. Villareal-Ramos's personal effects, and any evidence seized from Mr. Villareal-

18   Ramos or any third party.  This request also includes any material or percipient witnesses who might

19   be deported or otherwise likely to become unavailable (e.g. undocumented aliens and transients).

20           It is requested that the prosecutor be ordered to *question* all the agencies and individuals

21   involved in the prosecution and investigation of this case to determine if such evidence exists, and

22   if it does exist, to inform those parties to preserve any such evidence.

23           9.    *Henthorn* Material.  Mr. Villareal-Ramos requests that the Assistant United States

24   Attorney ("AUSA") assigned to this case oversee (not personally conduct) a review of all personnel

25   files of each agent involved in the present case for impeachment material.  *See Kyles v. Whitley*, 514

26   U.S. 437, 438 (1995) (holding that "the individual prosecutor has a duty to learn of any favorable

27   evidence known to the others acting on the government's behalf in the case, including the police");

28   *United States v. Henthorn*, 931 F.2d 29 (9th Cir. 1991).  This request includes, but is not limited to,

any complaints filed (by a member of the public, by another agent, or any other person) against the agent, whether or not the investigating authority has taken any action, as well as any matter for which a disciplinary review was undertaken, whether or not any disciplinary action was ultimately recommended. Mr. Villareal-Ramos further requests production of any such information at least *one week* prior to the motion hearing and two weeks prior to trial. If the prosecutor is uncertain whether certain information should be disclosed pursuant to this request, this information should be produced to the Court in advance of the motion hearing and the trial for an *in camera* inspection.

10.    <u>Tangible Objects</u>. Mr. Villareal-Ramos requests the opportunity to inspect, copy, and test, as necessary, all other documents and tangible objects, including photographs, books, papers, documents, alleged narcotics, fingerprint analyses, vehicles, or copies of portions thereof, that are material to the defense or intended for use in the government's case-in-chief or were obtained from or belong to Mr. Villareal-Ramos. Fed. R. Crim. P. 16(a)(1)(E). Specifically, Mr. Villareal-Ramos requests **color copies** of all photographs in the government's possession of the alleged narcotics and the vehicle in which the narcotics were found.

11.    <u>Expert Witnesses</u>. Mr. Villareal-Ramos requests the name, qualifications, and a written summary of the testimony of any person that the government intends to call as an expert witness during its case in chief. Fed. R. Crim. P. 16(a)(1)(G). This summary should include a description of the witness' opinion(s), as well as the bases and the reasons for the opinion(s). *See United States v. Duvall*, 272 F.3d 825 (7th Cir. 2001) (finding that government's written expert notice did not adequately summarize or describe police detective's testimony in drug prosecution where notice provided only a list of the general subject matters to be covered and failed to identify what opinion the expert would offer on those subjects). This request includes, but is not limited to, disclosure of the qualifications of any government witness who will testify that he understands and/or speaks Spanish or any other foreign language that may have been used during the course of an interview with Mr. Villareal-Ramos or any other witness.

Mr. Villareal-Ramos requests the notice of expert testimony be provided at a minimum of *three weeks prior to trial* so that the defense can properly prepare to address and respond to this testimony, including obtaining its own expert and/or investigating the opinions, credentials of the

1   government's expert and obtain a hearing in advance of trial to determine the admissibility of

2   qualifications of any expert.  *See Kumho v. Carmichael Tire Co.*, 526 U.S. 137, 119 S. Ct. 1167,

3   1176 (1999) (trial judge is "gatekeeper" and must determine, reliability and relevancy of expert

4   testimony and such determinations may require "special briefing or other proceedings").

5           12.    *Impeachment evidence*.   Mr. Villareal-Ramos requests any evidence that any

6   prospective government witness has engaged in any criminal act whether or not resulting in a

7   conviction and whether any witness has made a statement favorable to Mr. Villareal-Ramos.  <u>See</u>

8   Fed. R. Evid. 608, 609 and 613.  Such evidence is discoverable under *Brady*, 373 U.S. 83.  <u>See</u>

9   *United States v. Strifler*, 851 F.2d 1197 (9th Cir. 1988) (witness' prior record); *Thomas v. United*

10  *States*, 343 F.2d 49 (9th Cir. 1965) (evidence that detracts from a witness' credibility).

11          13.    <u>Evidence of Criminal Investigation of Any Government Witness</u>. Mr. Villareal-Ramos

12  requests any evidence that any prospective witness is under investigation by federal, state or local

13  authorities for any criminal conduct.  *United States v. Chitty*, 760 F.2d 425 (2d Cir. 1985).

14          14.    <u>Evidence of Bias or Motive to Lie</u>.  Mr. Villareal-Ramos requests any evidence that

15  any prospective government witness is biased or prejudiced against Mr. Villareal-Ramos, or has a

16  motive to falsify or distort his or her testimony.  *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987);

17  *Strifler*, 851 F.2d 1197.

18          15.    <u>Evidence Affecting Perception, Recollection, Ability to Communicate, or Veracity</u>.

19  Mr. Villareal-Ramos requests any evidence, including any medical or psychiatric report or

20  evaluation, tending to show that any prospective witness's ability to perceive, remember,

21  communicate, or tell the truth is impaired; and any evidence that a witness has ever used narcotics

22  or other controlled substance, or has ever been an alcoholic.  *Strifler*, 851 F.2d 1197; *Chavis v. North*

23  *Carolina*, 637 F.2d 213, 224 (4th Cir. 1980).

24          16.    <u>Witness Addresses</u>.  Mr. Villareal-Ramos requests the name and last known address

25  of each prospective government witness. *See United States v. Napue*, 834 F.2d 1311 (7th Cir. 1987);

26  *United States v. Tucker*, 716 F.2d 576 (9th Cir. 1983) (failure to interview government witnesses by

27  counsel is ineffective); *United States v. Cook*, 608 F.2d 1175, 1181 (9th Cir. 1979) (defense has

28  equal right to talk to witnesses).  Mr. Villareal-Ramos also requests the name and last known address

1  of every witness to the crime or crimes charged (or any of the overt acts committed in furtherance

2  thereof) who will *not* be called as a government witness.  *United States v. Cadet*, 727 F.2d 1453

3  (9th Cir. 1984).

4         17.  <u>Name of Witnesses Favorable to the Defendant</u>.  Mr. Villareal-Ramos requests the

5  name of any witness who made any arguably favorable statement concerning Mr. Villareal-Ramos

6  or who could not identify him or who was unsure of his identity or participation in the crime charged.

7  *Jackson v. Wainwright*, 390 F.2d 288 (5th Cir. 1968); *Chavis*, 637 F.2d at 223; *Jones v. Jago*, 575

8  F.2d 1164,1168 (6th Cir. 1978); *Hudson v. Blackburn*, 601 F.2d 785 (5th Cir. 1979), *cert. denied*,

9  444 U.S. 1086 (1980).

10         18.  <u>Statements Relevant to the Defense</u>.  Mr. Villareal-Ramos requests disclosure of any

11  statement that may be "relevant to any possible defense or contention" that he might assert.

12  *United States v. Bailleaux*, 685 F.2d 1105 (9th Cir. 1982).  **This includes grand jury transcripts**

13  **that are relevant to the defense motion to dismiss the indictment.**

14         19.  <u>Jencks Act Material</u>.  Mr. Villareal-Ramos requests production in advance of the

15  motion hearing or trial of all material, including dispatch tapes, that the government must produce

16  pursuant to the Jencks Act, 18 U.S.C. § 3500 and Fed. R. Crim. P. 26.2.  A verbal acknowledgment

17  that "rough" notes constitute an accurate account of the witness' interview is sufficient for the report

18  or notes to qualify as a statement under section 3500(e)(1).  *Campbell v. United States*, 373 U.S. 487,

19  490-92 (1963); *see also United States v. Boshell*, 952 F.2d 1101 (9th Cir. 1991) (holding that

20  interview notes constitutes Jencks material when an agent reviews notes with the subject of the

21  interview); *see also United States v. Riley*, 189 F.3d 802, 806-808 (9th Cir. 1999).  Advance

22  production will avoid the possibility of delay of the motion hearing or trial to allow Mr. Villareal-

23  Ramos to investigate the Jencks material.  Mr. Villareal-Ramos requests pre-trial disclosure of such

24  statements to avoid unnecessary recesses and delays and to allow defense counsel to prepare for, and

25  use properly any Jencks statements during cross-examination.

26         20.  *Giglio* Information.  Pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), Mr.

27  Villareal-Ramos requests all statements and/or promises, expressed or implied, made to any

28  //

1    government witnesses, in exchange for their testimony in this case, and all other information that

2    could arguably be used for the impeachment of any government witnesses.

3          21.    <u>Agreements Between the Government and Witnesses</u>. Mr. Villareal-Ramos requests

4    discovery regarding any express or implicit promise, understanding, offer of immunity, of past,

5    present, or future compensation, or any other kind of agreement or understanding, including any

6    implicit understanding relating to criminal or civil income tax, forfeiture or fine liability, between

7    any prospective government witness and the government (federal, state and/or local). This request

8    also includes any discussion with a potential witness about or advice concerning any immigration

9    benefits, any contemplated prosecution, or any possible plea bargain, even if no bargain was made

10    or the advice not followed.

11          22.    <u>Informants and Cooperating Witnesses</u>. Mr. Villareal-Ramos requests disclosure of

12    the names and addresses of all informants or cooperating witnesses used or to be used in this case,

13    and in particular, disclosure of any informant who was a percipient witness in this case or otherwise

14    participated in the crime charged against Mr. Villareal-Ramos. The government must disclose the

15    informant's identity and location, as well as disclose the existence of any other percipient witness

16    unknown or unknowable to the defense. *Roviaro v. United States*, 353 U.S. 52, 61-62 (1957). The

17    government must disclose any information derived from informants that exculpates or tends to

18    exculpate Mr. Villareal-Ramos.

19          23.    <u>Bias by Informants or Cooperating Witnesses</u>. Mr. Villareal-Ramos requests disclosure

20    of any information indicating bias on the part of any informant or cooperating witness. *Giglio*,

21    405 U.S. 24. Such information would include what, if any, inducements, favors, payments or threats

22    were made to the witness to secure cooperation with the authorities.

23          24.    <u>Personnel Records of Government Officers Involved in the Arrest</u>. Mr. Villareal-

24    Ramos requests all citizen complaints and other related internal affairs documents involving any of

25    the immigration officers or other law enforcement officers who were involved in the investigation,

26    arrest and interrogation of Mr. Villareal-Ramos. *See Pitchess v. Superior Court*, 11 Cal. 3d 531, 539

27    (1974). Because of the sensitive nature of these documents, defense counsel will be unable to

28    procure them from any other source.

                08CR0095-BEN

25.     <u>Training of Relevant Law Enforcement Officers</u>.  Mr. Villareal-Ramos requests copies of all written videotaped or otherwise recorded policies or training instructions or manuals issued by all law enforcement agencies involved in the case (United States Customs Service, Border Patrol, INS, Department of Homeland Security, etc.) to their employees regarding:  (a) the handling of vehicles suspected to be transporting contraband across the port of entry; (b) the referral to secondary inspection of persons within those vehicles; (c) the detention of individuals within those vehicles; (d) the search of those vehicles and the occupants of those vehicles, including the proper means of obtaining consent to search and what constitutes consent to search; (e) the informing of suspects of their Constitutional rights; (f) the questioning of suspects and witnesses.  Mr. Villareal-Ramos also requests all written or otherwise attainable information regarding the training of Customs agents at ports of entry in California to detect or discover contraband in vehicles entering the United States, including any training offered to Border Patrol, INS, or officers of Homeland Security Department, by the DEA or other law enforcement agencies or individuals.

26.     <u>Performance Goals and Policy Awards</u>.  Mr. Villareal-Ramos requests disclosure of information regarding standards used for measuring, compensating or reprimanding the conduct of all law enforcement officers involved in the case (Customs, Border Patrol, INS, etc.) to the extent such information relates to the detection of contraband.  This request specifically includes information concerning performance goals, policy awards, and the standards used by Customs for commending, demoting, or promoting agents for their performance at the port of entry and their success or failure to detect illegal narcotics in general.

27.     <u>TECS Reports</u>.  Mr. Villareal-Ramos requests all TECS reports, including reports pertaining to all vehicle border crossings pertaining to the vehicle used in this case and any vehicles pertaining to Mr. Villareal-Ramos.  **Any prior border crossings are considered "other acts" evidence which the government must produce before trial**.  *Vega*, 188 F.3d at 1154.

28.     <u>Reports of Scientific Tests or Examinations</u>.  Pursuant to Fed. R. Crim. P. 16(a)(1)(F), Mr. Villareal-Ramos requests the reports of all tests and examinations conducted upon the evidence in this case, including, but not limited to, any fingerprint testing done upon any evidence seized in this case, that is within the possession, custody, or control of the government, the existence of which

1    is known, or by the exercise of due diligence may become known, to the attorney for the government,

2    and that are material to the preparation of the defense or are intended for use by the government as

3    evidence in chief at the trial.

4        29.    _Brady_ Information.  The defendant requests all documents, statements, agents' reports,

5    and tangible evidence favorable to the defendant on the issue of guilt and/or which affects the

6    credibility of the government's case.  Under _Brady v. Maryland_, 373 U.S. 83 (1963), impeachment

7    as well as exculpatory evidence falls within the definition of evidence favorable to the accused.

8    _United States v. Bagley_, 473 U.S. 667 (1985); _United States v. Agurs_, 427 U.S. 97 (1976).

9        30.    Any Proposed 404(b) Evidence.  The government must produce evidence of prior

10   similar acts under Fed. R. Crim. P. 16(a)(1) and Fed. R. Evid. 404(b) and any prior convictions

11   which would be used to impeach as noted in Fed. R. Crim. P. 609.  In addition, under Fed. R. Evid.

12   404(b), "upon request of the accused, the prosecution . . . shall provide reasonable notice in advance

13   of trial . . . of the general nature" of any evidence the government proposes to introduce under

14   Fed. R. Evid. 404(b) at trial.  The defendant requests notice two weeks before trial to give the

15   defense time to investigate and prepare for trial.

16       31.    Specific Request.  Mr. Villareal-Ramos specifically requests the opportunity to view

17   the "A-File" of the material witness in this case.

18       32.    Residual Request.  The defendant intends by this discovery motion to invoke her rights

19   to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the

20   Constitution and laws of the United States.

21                                              **III.**

22   **THE INDICTMENT SHOULD BE DISMISSED BECAUSE THE**
     **INSTRUCTIONS PROVIDED TO THE JANUARY 2007 GRAND JURY RUN AFOUL**
23   **OF BOTH _NAVARRO-VARGAS_ AND _WILLIAMS_.**

24   **A.    _Navarro-Vargas_ Establishes Limits on the Ability of Judges to Constrain the Powers of**
     **the Grand Jury.**
25

26       The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions

27   given to grand jurors in the Southern District of California.  _See Navarro-Vargas II_, 408 F.3d 1184.

28   While the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the course of

1    adopting a highly formalistic approach[6] to the problems posed by the instructions, endorsed many

2    of the substantive arguments raised by the defendants in those cases.  The district court's instructions

3    cannot be reconciled with the role of the grand jury as set forth in *Navarro-Vargas II*.

4         For instance, with respect to the grand jury's relationship with the prosecution, the *Navarro-*

5    *Vargas II* majority acknowledges that the two institutions perform similar functions: "'the public

6    prosecutor, in deciding whether a particular prosecution shall be instituted or followed up, performs

7    much the same function as a grand jury.'"  *Navarro-Vargas II*, 408 F.3d at 1200 (quoting *Butz v.*

8    *Economou*, 438 U.S. 478, 510 (1978)).  *Accord Navarro-Vargas I*, 367 F.3d at 900 (Kozinski, J.,

9    dissenting) (The grand jury's discretion in this regard "is most accurately described as

10   prosecutorial.").  *See also Navarro-Vargas II*, 408 F.3d at 1213 (Hawkins, J., dissenting).  It

11   recognizes that the prosecutor is not obligated to proceed on any indictment or presentment returned

12   by a grand jury, id., but also that "the grand jury has no obligation to prepare a presentment or to

13   return an indictment drafted by the prosecutor." *Id. See* Niki Kuckes, *The Democratic Prosecutor:*

14   *Explaining the Constitutional Function of the Federal Grand Jury*, 94 Geo. L.J. 1265, 1302 (2006)

15   (the grand jury's discretion not to indict was "'arguably . . . the most important attribute of grand jury

16   review from the perspective of those who insisted that a grand jury clause be included in the Bill of

17   Rights'") (quoting Wayne LaFave et al., *Criminal Procedure* § 15.2(g) (2d ed. 1999)).

18        Indeed, the *Navarro-Vargas II* majority agrees that the grand jury possesses all the attributes

19   set forth in *Vasquez v. Hillery*, 474 U.S. 254 (1986).  *See id.*

20        The grand jury thus determines not only whether probable cause exists, but also
          whether to "charge a greater offense or a lesser offense; numerous counts or a single
21        count; and perhaps most significant of all, a capital offense or a non-capital offense --
          all on the basis of the same facts.  And, significantly, the grand jury may refuse to
22        return an indictment even "'where a conviction can be obtained.'"

23   //

24   //

25

26        [6]   *See Navarro-Vargas II*, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the
     majority because "[t]he instruction's use of the word 'should' is most likely to be understood as
27   imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's
     constitutional independence.").
28

1   *Id.* (quoting *Vasquez*, 474 U.S. at 263).   The Supreme Court has itself reaffirmed *Vasquez*'s

2   description of the grand jury's attributes in *Campbell v. Louisiana*, 523 U.S. 392 (1998), noting that

3   the grand jury "controls not only the initial decision to indict, but also significant questions such as

4   how many counts to charge and whether to charge a greater or lesser offense, including the important

5   decision whether to charge a capital crime."  *Id.* at 399 (citing *Vasquez*, 474 U.S. at 263).

6        Judge Hawkins notes that the *Navarro-Vargas II* majority accepts the major premise of

7   *Vasquez*: "the majority agrees that a grand jury has the power to refuse to indict someone even when

8   the prosecutor has established probable cause that this individual has committed a crime."  *See* id.

9   at 1214 (Hawkins, J. dissenting).  *Accord Navarro-Vargas I*, 367 F.3d at 899 (Kozinski, J.,

10  dissenting); *Marcucci*, 299 F.3d at 1166-73 (Hawkins, J., dissenting).  In short, the grand jurors'

11  prerogative not to indict enjoys strong support in the Ninth Circuit.  But not in Judge Burns'

12  instructions.

13  **B.    The Instructions Forbid the Exercise of Grand Jury Discretion Established in Both**
14  **     *Vasquez* and *Navarro-Vargas II*.**

15       The *Navarro-Vargas II* majority found that the instruction in that case "leave[s] room for the

16  grand jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its

17  previous decision in *Marcucci*.  *Marcucci* reasoned that the instructions do not mandate that grand

18  jurors indict upon every finding of probable cause because the term "should" may mean "what is

19  probable or expected." 299 F.3d at 1164 (citation omitted).  That reading of the term "should" makes

20  no sense in context, as Judge Hawkins ably pointed out.  *See Navarro-Vargas II*, 408 F.3d at 1210-

21  11 (Hawkins, J., dissenting) ("The instruction's use of the word 'should' is most likely to be

22  understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe

23  the grand jury's constitutional independence.").  *See also id*. ("The 'word' should is used to express

24  a duty [or] obligation.") (quoting *The Oxford American Diction and Language Guide* 1579 (1999)

25  (brackets in original)).

26       The debate about what the word "should" means is irrelevant here; the instructions here make

27  no such fine distinction.  The grand jury instructions make it painfully clear that grand jurors simply

28  may not choose not to indict in the event of what appears to them to be an unfair application of the

1   law: should "you disagree with that judgment made by Congress, then your option is not to say 'well,

2   I'm going to vote against indicting even though I think that the evidence is sufficient'...." *See* Ex.

3   A at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because they

4   disagree with a proposed prosecution. No grand juror would read this language as instructing, or

5   even allowing, him or her to assess "the need to indict." *Vasquez*, 474 U.S. at 264.

6       Nor does the *Navarro-Vargas II* majority's faith in the structure of the grand jury a cure for

7   the instructions excesses. The *Navarro-Vargas II* majority attributes "[t]he grand jury's discretion --

8   its independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of

9   its decisions." 408 F.3d at 1200. As a result, the majority discounts the effect that a judge's

10  instructions may have on a grand jury because "it is the *structure* of the grand jury process and its

11  *function* that make it independent." *Id.* at 1202 (emphases in the original).

12      Judge Hawkins sharply criticized this approach. The majority, he explains, "believes that the

13  'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and

14  unreviewability of many of its decisions -- sufficiently protects that power." *See id.* at 1214

15  (Hawkins, J., dissenting). The flaw in the majority's analysis is that "[i]nstructing a grand jury that

16  it lacks power to do anything beyond making a probable cause determination ... unconstitutionally

17  undermines the very structural protections that the majority believes save[] the instruction." *Id.*

18  After all, it is an "'almost invariable assumption of the law that jurors follow their instructions.'" *Id.*

19  (quoting *Richardson v. Marsh*, 481 U.S. 200, 206 (1987)). If that "invariable assumption" were to

20  hold true, then the grand jurors could not possibly fulfill the role described in *Vasquez*. Indeed,

21  "there is something supremely cynical about saying that it is fine to give jurors erroneous instructions

22  because nothing will happen if they disobey them." *Id.*

23      In setting forth Judge Hawkins' views, Ms. Vasquez understands that this Court may not

24  adopt them solely because the reasoning that supports them is so much more persuasive than the

25  majority's sophistry. Rather, he sets them forth to urge the Court *not to extend* what is already

26  untenable reasoning.

27      Here, again, the question is not an obscure interpretation of the word "should", but an

28  absolute ban on the right to refuse to indict that directly conflicts with the recognition of that right

1 in *Vasquez*, *Campbell*, and both *Navarro-Vargas II* opinions. *Navarro-Vargas II* is distinguishable

2 on that basis, but not only that.

3      Judge Burns did not limit himself to denying the grand jurors the power that <u>Vasquez</u> plainly

4 states they enjoy. He also apparently excused prospective grand jurors who might have exercised

5 that Fifth Amendment prerogative, excusing "three [jurors] in this case, because they could not

6 adhere to [that] principle...." *See* Ex. A at 8. The structure of the grand jury and the secrecy of its

7 deliberations cannot embolden grand jurors who are no longer there, likely because they expressed

8 their willingness to act as the conscience of the community. *See Navarro-Vargas II*, 408 F.3d at

9 1210-11 (Hawkins, J., dissenting) (a grand jury exercising its powers under *Vasquez* "serves ... to

10 protect the accused from the other branches of government by acting as the 'conscience of the

11 community.'") (quoting *Gaither v. United States*, 413 F.2d 1061, 1066 & n.6 (D.C. Cir. 1969)). The

12 federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand

13 jury procedure," *United States v. Williams*, 504 U.S. 36, 50 (1992), and, here, Judge Burns has both

14 fashioned his own rules and enforced them. The instructions here are therefore structural error. *See*

15 *Navarro-Vargas II*, 408 at 1216-17 (Hawkins, J., dissenting). The indictment must be dismissed.

16 **C.    The Instructions Conflict With *Williams*' Holding that there Is No Duty to Present**
       **Exculpatory Evidence to the Grand Jury.**

17

18      In *Williams*, the defendant, although conceding that it was not required by the Fifth

19 Amendment, argued that the federal courts should exercise their supervisory power to order

20 prosecutors to disclose exculpatory evidence to grand jurors, or, perhaps, to find such disclosure

21 required by Fifth Amendment common law. *See* 504 U.S. at 45, 51. *Williams* held that "as a general

22 matter at least, no such 'supervisory' judicial authority exists." *See id.* at 47. Indeed, although the

23 supervisory power may provide the authority "to dismiss an indictment because of misconduct before

24 the grand jury, at least where that misconduct amounts to a violation of one of those 'few, clear rules

25 which were carefully drafted and approved by this Court and by Congress to ensure the integrity of

26 the grand jury's functions,'" *id.* at 46 (citation omitted), it does not serve as "a means of *prescribing*

27 such standards of prosecutorial conduct in the first instance." *Id.* at 47 (emphasis added). The

28 federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand

1   jury procedure." *Id.* at 50. As a consequence, *Williams* rejected the defendant's claim, both as an

2   exercise of supervisory power and as Fifth Amendment common law. *See id.* at 51-55.

3       Despite the holding in *Williams*, the instructions here assure the grand jurors that prosecutors

4   would present to them evidence that tended to undercut probable cause. *See* Ex. A at 20.

5           Now, again, this emphasizes the difference between the function of the grand jury
            and the trial jury. You're all about probable cause. If you think that there's evidence
6           out there that might cause you say "well, I don't think probable cause exists," then it's
            incumbent upon you to hear that evidence as well. As I told you, in most instances,
7           *the U.S. Attorneys are duty-bound to present evidence that cuts against what they*
            *may be asking you to do if they're aware of that evidence.*
8

9   *Id.* (emphasis added). Moreover, the district court later returned to the notion of the prosecutors and

10  their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear

11  in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters

12  presented to you." *See id.* at 27.

13      This particular instruction has a devastating effect on the grand jury's protective powers,

14  particularly if it is not true. It begins by emphasizing the message that *Navarro-Vargas II* somehow

15  concluded was not conveyed by the previous instruction: "You're all about probable cause." *See* Ex.

16  A at 20. Thus, once again, the grand jury is reminded that they are limited to probable cause

17  determinations (a reminder that was probably unnecessary in light of the fact that Judge Burns had

18  already told the grand jurors that they likely would be excused if they rejected this limitation). The

19  instruction goes on to tell the grand jurors that they should consider evidence that undercuts probable

20  cause, but also advises the grand jurors that the prosecutor will present it. The end result, then, is

21  that grand jurors should consider evidence that goes against probable cause, but, if none is presented

22  by the government, they can presume that there is none. After all, "in most instances, the U.S.

23  Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do

24  if they're aware of that evidence." *See id.* Thus, if the exculpatory evidence existed, it necessarily

25  would have been presented by the "duty-bound" prosecutor, because the grand jurors "can expect that

26  the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll

27  act in good faith in all matters presented to you." *See id.* at 27.

28  //

1   These instructions create a presumption that, in cases where the prosecutor does not present

2   exculpatory evidence, no exculpatory evidence exists. A grand juror's reasoning, in a case in which

3   no exculpatory evidence was presented, would proceed along these lines:

4   (1) I have to consider evidence that undercuts probable cause.
    (2) The candid, honest, duty-bound prosecutor would, in good faith, have presented any such
5   evidence to me, if it existed.
    (3)  Because no such evidence was presented to me, I may conclude that there is none.

6

7   Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the

8   evidence presented represents the universe of all available exculpatory evidence; if there was more,

9   the duty-bound prosecutor would have presented it.

10      The instructions therefore discourage investigation -- if exculpatory evidence were out there,

11  the prosecutor would present it, so investigation is a waste of time -- and provide additional support

12  to every probable cause determination: i.e., this case may be weak, but I know that there is nothing

13  on the other side of the equation because it was not presented.  A grand jury so badly misguided is

14  no grand jury at all under the Fifth Amendment.

15                                      **III.**

16         **THIS COURT SHOULD GRANT LEAVE TO FILE FURTHER MOTIONS**

17      Mr. Villareal-Ramos and defense counsel have received 282 pages of discovery in this case

18  and 7 DVDs containing taped statements.  Defense counsel has reason to believe this discovery is

19  incomplete. Defense counsel requests leave to file further motions as new information comes to

20  light.

21                                      **IV.**

22                                 **CONCLUSION**

23      For the reasons stated, Mr. Villareal-Ramos requests that this Court grant her motions.

24                              Respectfully submitted,

25

26  DATED:     February 25, 2008        */s/ Leila W. Morgan*
27                                      **LEILA W. MORGAN**
                                        Federal Defenders of San Diego, Inc.
                                        Attorneys for Mr. Villareal-Ramos
28                                      Leila_Morgan@fd.org